[Sac. No. 5352. In Bank. July 21, 1944.]

ROBERT LILBURN PRATHER, as Executor, etc., et al., Respondents, v. MAX HOBERG, Appellant.

Breed, Burpee & Robinson and Derby, Sharp, Quinby & Tweedt for Appellant.

Huston, Huston & Huston, H. G. Crawford and T. P. Wittschen for Respondents.

SHENK, J.—This is an appeal by defendant from a judgment apportioning certain waters between himself and plaintiffs as riparian owners, awarding damages to plaintiffs for wrongful diversion from an underground stream, and enjoining defendant from using any of the water upon a certain parcel of his property until such time as its riparian character may be determined. The questions argued before this court concern in the main the sufficiency of the relief accorded by the decree.

The plaintiffs and the defendant maintain respective summer resorts on adjoining properties located in the Boggs Mountain district of Lake County. Defendant's land, located at the higher elevation, consists of three parcels, Lot One of 17 acres on which the resort is largely located, Parcel

Two to the south containing 160 acres designated as Lots 2, 3 and 4, on which his resort is partly located, and Parcel Three to the west, which is not involved in this litigation. Plaintiff's own two northerly contiguous tracts, Tract One consisting of 160 acres known as the Price Ranch, and Tract Two, consisting of about 200 acres, upon which their resort is located.

On the Price Ranch, about 100 feet north of its common boundary with defendant's Lot One, is located a perennial spring known as Prather Spring, which is fed by an underground stream. This underground stream, the trial court found, flows beneath plaintiffs' property and also beneath defendant's Lot One, but the court reserved for future adjudication the question whether it flows beneath defendant's Parcel Two. At Prather Spring the water emerges above the surface of the ground, and a small stream called Big Canyon Creek flows down a well-defined channel through a swale or gulch on a portion of the Price Ranch, and thence northeasterly over plaintiffs' Tract Two to an angle from which it continues southeasterly across that tract. Both of the plaintiffs' tracts of land border on both sides of the creek, and for many years plaintiffs had sufficient water for the purposes of their resort and for the irrigation of about 15 acres of the Price Ranch. For more than 40 years prior to this litigation their resort had been patronized annually by hundreds of guests.

In 1921, at a point near the common boundary, or northerly line of defendant's Lot One, and about 200 feet south of Prather Spring, defendant started to construct, without the knowledge or consent of plaintiffs, a tunnel which extended for some distance into Boggs Mountain and tapped the water supply in the underground stream. By means of this tunnel, which was completed in 1924, the defendant diverted what the trial court found to be "unreasonably large portions of water" and used it exclusively to supply the needs of his resort, both the portion located on Lot One and that located on Parcel Two.

Prior to the time of this diversion defendant's resort had not had a patronage of guests approximating the number which annually visited plaintiffs' resort. But after the diversion, the supply of water in Prather Spring and Big Canyon Creek increasingly diminished from year to year, so that

plaintiffs were finally obliged to abandon the cultivation of acreage on the Price Ranch and to discontinue the maintenance of a small dairy and garden on their other tract, and they were also faced with an insufficient supply of water for maintenance of their resort. The result was that the number of transient guests at defendant's resort in subsequent years approximated those at plaintiffs' resort, and this growth, the trial court found, had to a material extent been made possible by defendant's "diversion of the water supply to his whole resort and not alone Lot One (1) to plaintiff's substantial injury."

Plaintiffs first discovered the diversion in 1929, and brought this action in August, 1930, seeking to quiet their title to the waters of the stream, to restrain defendant from diminishing the flow, and for damages and general relief. Issues were joined by answer, cross-complaint, and answer to cross-complaint.

A prolonged hearing was had commencing in the year 1933. Extensive tests were conducted for the purpose of determining whether there was any relation between defendant's diversion at the tunnel from the underground stream and the diminishing flow in Prather Spring and Big Canyon Creek, or whether said diminishing flow was due to natural causes resulting from the dry cycle which Lake County and the rest of the state had experienced for some years. Defendant asserted that when water was first struck at the end of the tunnel he had investigated the effect on the Prather Spring and found that the flow had not been affected. Plaintiffs introduced evidence to the contrary indicating that there was a substantial connection between the supply in the tunnel and the supply in the Prather Spring. The result of the tests was not conclusive. Finally, in July, 1936, the trial judge rendered a preliminary opinion wherein he expressed himself as "abundantly satisfied that a substantial and relatively direct connection exists between the two points" of water supply, and declared the case to be "a very proper one for the application of the doctrine of apportionment."

Before the case was concluded the dry cycle was broken by the wet winter of 1937-1938. In August, 1938, the trial judge rendered a second memorandum opinion announcing his views on the matter of apportionment, and his intention to award

plaintiffs $2,500 damages. In October, 1938, defendant sought to have the case reopened for the purpose of introducing evidence of the effect of the preceding heavy winter rains on the water sources involved, of requiring continuous pumping tests under court order, of showing the results of the drilling of many new wells upon defendant's property, and for a reference of issues of fact required to be determined as a result of this new evidence to a court expert or to the State Water Commission. In November, 1938, the trial court denied the motion to reopen; in February, 1939, it denied a similar motion to reopen or for an interlocutory judgment; in April, 1939, findings of fact and conclusions of law were made and filed and judgment was rendered in plaintiffs' favor; and in May, 1939, a motion for new trial was denied. Defendant appealed.

One of the main points urged by defendant on the appeal is that of abuse of discretion on the part of the trial court in refusing to reopen the case for further and determinative evidence upon disputed issues and issues reserved for future adjudication, and in refusing to grant a new trial. Insufficiency of the evidence to support the findings, inconsistencies in the findings and judgment, error in failing to determine whether defendant's Parcel Two is or is not riparian to the underground stream, and improprieties in the type of relief accorded are other grounds urged for reversal.

For present purposes it may be assumed, without determining the issue, that the record contains sufficient evidence to support the findings to the effect that the underground stream is a source of supply both for defendant's diversion at the tunnel and for Prather Spring, and that there is a direct connection between the two so that any taking at the tunnel is reflected in a proportionately diminished flow at the spring and down Big Canyon Creek.

In addition to the foregoing, the record shows and the court found and concluded:

1. That plaintiffs' lands are traversed by the underground stream; that defendant's Lot One is riparian to it, but that the question whether defendant's Parcel Two is also riparian is reserved for future adjudication. More specifically the court found that all water diverted by defendant prior to the commencement of this action in excess of the amount apportioned to him, as hereinafter set forth, was in excess

of the amount required for reasonable and beneficial use on Lot One; and that "the evidence is insufficient to enable the court to specifically determine whether or not any part of Parcel Two . . . is riparian to the said underground stream, and therefore jurisdiction is hereby reserved for future determination and adjudication by the court as to whether there are any other underground stream or streams or sources of water supply on said Lot One (1) other than stated in these findings. The court reserves jurisdiction to adjudge and determine the quantity of water said defendant may be entitled to divert from said underground stream on Parcel Two."

2. That plaintiffs have a much greater need for irrigation for agricultural purposes based upon acreage and considerations of past and possible future use than defendant; that there is no substantial agricultural use on defendant's Lot One. That nevertheless defendant, by means of his tunnel and pumping system, diverted "an unreasonably large portion" of the flow of the underground stream, amounting in some instances to approximately 50,000 gallons of water a day. That the more recent growth of defendant's resort has been made possible by his diversion of the water supply "to his whole resort and not alone Lot One (1) to plaintiff's substantial injury."

3. That the water diverted by defendant was used upon all of his property, "including portions of said Parcel Two . . . not situated within the same watershed as Parcel One (1) and the Prather Spring but being situated in Kelsey Creek watershed; that said defendant so diverted waters from said tunnel for use upon lands which are not riparian to said stream." That defendant diverted more water than could be applied to a beneficial use on Lot One, "substantial portions thereof having been diverted to and used upon lands not in the watershed of the said underground stream."

4. That the amount of water required by plaintiffs "for natural and domestic use" and the use of the resort is a flow of 258 gallons per minute; and the reasonable quantity required by plaintiffs for irrigation of 15 acres of the Price Ranch "is not less than two acre feet per acre per annum"; that prior to defendant's diversion this amount of supply was, under normal conditions, available to plaintiffs, but since the

diversion there has not been enough water to supply plaintiffs' reasonable and actual needs.

5. That the tunnel is not the sole source of defendant's water supply as defendant has, since the filing of this action, developed a supply from wells situated on his land, but not on Lot One and not within the watershed of Big Canyon Creek. That "the quantity of water reasonably required and which can be applied to a beneficial use" on Lot One by defendant is "one-fifth (⅕) of the dependable supply at Hoberg tunnel without change of the physical condition of the tunnel or the present method of making such diversion, or its capacity, which, until further order of the court, is fixed at six thousand (6000) gallons per day pumped by the said defendant at the rate of sixteen (16) gallons per minute."

6. That as against defendant, plaintiffs are entitled to use all of the water flowing into Prather Spring and Big Canyon Creek except the quantity so apportioned to defendant, being the amount he requires for a reasonable or beneficial use on Lot One, "and such waters, if any as the Court may hereafter determine the said defendant may divert [for] Parcel Two"; that the water which defendant "is entitled to is equal to one-fifth (⅕) of the dependable daily supply" at the tunnel "pumped at the time and manner hereinbefore fixed."

7. That "by reason of the acts of the said defendant, the said plaintiff has been and is damaged in the sum" of $2,500.

8. That defendant's Lot One is riparian; that defendant "has no right to divert water from the said underground stream described in the findings, except as apportioned to the said defendant for use on said Lot One (1) mentioned in the findings and this judgment, and upon such portions of Parcel Two (2) mentioned in the findings as may hereafter be determined to be riparian."

By comparing the findings described in Item 1 with those described in Item 3 and the provision of the judgment mentioned in Item 8, it is seen that although the trial court more than once specifically reserved for future adjudication the question whether defendant's Parcel Two is riparian to the underground stream (Item 1), yet it also more than once expressly declared that portions of Parcel Two were not situated within the same watershed as Parcel One and Prather Spring, but were situated in Kelsey Creek watershed, and that part of the water diverted was being used upon said

lands "which are not riparian to said stream" (Item 3). By thus expressly finding that part of Parcel Two is in a different watershed and not riparian, and leaving the question open as to the character of the remainder of that parcel the case is left in part undecided and thus one of the essential foundation elements to support the judgment is lacking.

Plaintiffs argue that the burden was upon defendant to show that Parcel Two or some part thereof is riparian and, having failed to sustain this burden, he was benefited and not injured by the court's reservation of jurisdiction, for if the court had made any determination on the evidence, it would have been, necessarily, that the land was nonriparian.

Whether under the pleadings in this case the burden was upon the defendant to prove that Parcel Two or some part thereof is riparian need not be decided for the reason that the defendant offered to assume that burden and was denied the right to sustain it. Furthermore, the defendant received no benefit from the reservation of jurisdiction. In fact he sought to avoid it by his successive motions to reopen the case and for an interlocutory judgment. He asserts that if he had been permitted to introduce additional evidence establishing at least a portion of Parcel Two as riparian, he would have been entitled not only to a greater apportionment of water, but also to a reduction in the damages, if any, to be awarded. ▇▇▇▇ In a case such as this, where the parties litigant own all of the land bordering on the stream, there being no other riparian owners, a trial court may not properly make an apportionment of water and award of damages without taking all of the lands into consideration and determining the riparian or nonriparian character of each parcel. The hiatus in the evidence may well have been anticipated by the defendant when he offered to produce additional evidence to supply any deficiencies or uncertainties in the proof. To reserve jurisdiction to determine an issue so essential to a just and equitable determination of the case was in effect to fail to decide the case in a very substantial respect. Then to refuse to receive additional evidence to complete the record on this material issue amounted to an abuse of discretion. In other words, until the court had determined what part of defendant's land is riparian to the water supply, no proper basis was established for determining either the portion of

the water to which defendant is entitled, the land upon which the water may rightfully be used, or the damage, if any, caused by defendant's wrongful use.

The findings do not show the precise basis for the award of damages to plaintiff in the sum of $2,500. The judgment appears to rest upon the general finding of damage "by reason of the acts of said defendant." Just what those acts were is uncertain. If they consisted in taking the water diverted at the tunnel out of the watershed and using it upon the nonriparian portion of Parcel Two located in a different watershed, actionable damage would result. If, however, they included the use by defendant of the diverted water upon portions of Parcel Two which are riparian, then the remedy as to the riparian use is not in damages but for apportionment. The uncertainty in the findings on this point emphasizes the error of the trial court in failing to fix the character of Parcel Two. If Lot One and Parcel Two or a major portion of the latter parcel are both riparian, then defendant is entitled to make reasonable and beneficial use of the diverted water on both areas. The extent of his riparian right necessarily affects directly the amount of damages, if any, to which the plaintiffs may be entitled. It is impossible to adjudicate the amount of damage without first determining to what extent the diversion and use of the water was wrongful.

A like problem arises with reference to the issue of apportionment. The court found that all water diverted by defendant prior to the filing of this action in excess of the amount apportioned, was in excess of the amount required for reasonable and beneficial use on Lot One; that other sources of water supply were available on portions of Parcel Two located without the watershed; and that the quantity reasonably required for beneficial use on Lot One was one-fifth of the dependable supply at the tunnel. But if Parcel Two or any part of it is riparian, the apportionment should include the amount of water reasonably required for beneficial use on so much of that parcel as is riparian. The trial court was not warranted in cutting defendant's supply to one-fifth, thus endangering the life of his resort unless other water sources could be developed, when there was also placed in issue the question whether defendant was entitled to an apportionment for Parcel Two, or some part of it.

The trial court described the apportionment to defendant as "one fifth (⅕) of the dependable supply at Hoberg tunnel without change of the physical condition of the tunnel or the present method of making such diversion, or its capacity, which, until further order of the court, is fixed at six thousand (6000) gallons per day pumped by the said defendant at the rate of sixteen (16) gallons per minute."

It is to be noted that 6,000 gallons per day would be 4⅙ gallons per minute for a twenty-four hour day, whereas 16 gallons per minute would be 23,040 gallons for such a day. What is meant, we assume, is that defendant could pump daily at the rate of 16 gallons per minute until 6,000 gallons had been taken.

Defendant's unreasonable diversion at the tunnel, and hence impliedly his need, was found to have approximated 50,000 gallons a day, or 34¹⁹⁄₃₆s gallons per minute. Assuming as the trial court found, that the entire water supply from Prather Spring and Big Canyon Creek was sufficient, prior to any diversion at the tunnel, to meet plaintiffs' requirement of an estimated 258 gallons per minute or 371,520 gallons a day, plus two acre feet per acre per annum to irrigate 15 acres of the Price Ranch, which according to counsel's computation is the equivalent of 73 gallons per minute for six months' continuous pumping, it is seen how disproportionately small is the allotment to defendant of but 6,000 gallons a day. While that is one-fifth of the estimated dependable supply at the tunnel of 30,000 gallons per day, it is less than one-sixtieth of the supply normally available to the plaintiffs of 371,520 gallons per day, without adding the estimated 73 gallons per minute allowed for six months' pumping for the Price Ranch. Under this calculation it is difficult to see how defendant's diversion of approximately 50,000 gallons per day could have appreciably affected the supply of water to plaintiffs' damage.

Then, too, the judgment fails to make provision for seasonal fluctuation in the quantity of water available to both parties. By limiting defendant to 6,000 gallons a day it in effect allows plaintiffs all of the water over that amount irrespective of the available supply. ■ As between riparian owners it is preferable, whenever possible, to have an apportionment decreed in terms of a percentage or proportional allotment.

The reason is obvious. ■ A riparian owner has no right to any mathematical or specific amount of the water of a stream as against other like owners. He has only a right in common with the owners to take a proportional share from the stream—a correlative right which he shares reciprocally with the other riparian owners. ■ No mathematical rule has been formulated to determine such a right, for what is a reasonable amount varies not only with the circumstances of each case but also varies from year to year and season to season. (*Pabst* v. *Finmand,* 190 Cal. 124 [211 P. 11]; 25 Cal.Jur. pp. 1135-1146, and cases cited.) Although problems of measurement and pumping engendered by reason of the underground character of the flow may have impelled the specific allotment in this case, it may be possible upon the retrial to decree an apportionment in a proportional or some other more equitable form. ■ The apportionment should be measured in the "manner best calculated to a reasonable result," and the court may adopt any standard of measurement "that is reasonable on the facts to secure equality" (Wiel on Water Rights (3d ed.) p. 820, § 751).

In another respect the findings and judgment are uncertain in specifying the basis of the apportionment. The trial judge expressed the view that in an apportionment between riparian owners a "natural" as distinguished from an "artificial" use was entitled to preference; that a use for resort purposes was an artificial commercial use contributing to the land owner's profit in a business enterprise, a use not within the purview of a "natural use" by a riparian owner arising out of the necessities of life on the riparian land, such as a household and drinking use and the watering of stock, and that here, so far as any purely domestic need or natural use is concerned, the issue may be eliminated as each party has a sufficient water supply for such purpose distinct from the supply in controversy.

In the findings, however, the court declared, apparently as the basis for the apportionment, that there is no substantial agricultural use for any of the water on defendant's Lot One of 17 acres; that "the plaintiffs have a much greater need for irrigation for agricultural purposes *based upon acreage and considerations of past and possible future use* than the said defendant; that the resort . . . of plaintiffs has for a long time been larger than defendant's, and from the standpoint

of existing permanent improvements as well as area of riparian land to be capable of greater expansion and under a heavier necessity for the use of the said water supply from the said underground stream supplying the said Hoberg tunnel and Prather Spring, than defendant herein; that only recently has the number even of transient guests at defendant's resort approximated those at plaintiffs', and the more recent growth of the said defendant's resort has, to a material extent been made possible by the defendant's diversion of the water supply to his whole resort and not alone Lot One (1) to plaintiff's substantial injury.''

The consideration of the element of a greater past commercial use by plaintiffs than by defendant would seem to be immaterial, for it is the present reasonable beneficial uses to which the water may properly be put by the riparian owners, consideration being given of course to preferential uses, that determines an apportionment.

So far as acreage is concerned, plaintiffs possess 200 acres in Tract Two, upon which their resort and former garden and dairy are located, and 160 acres in Tract One or the Price Ranch, only 15 acres of which were formerly cultivated, or 360 acres in all. Defendant's Lot One contains 17 acres, uncultivated, and Parcel Two contains 160 acres, or a total of 177 acres involved in this controversy. Assuming that in reaching a basis for computation of its apportionment the trial court compared the respective acreage which it considered to be entitled to preferential agricultural use, and then the water requirements of the respective competing resorts, which are now of about equal size, it would appear that the acreage was not properly considered as an element in the absence of a determination as to what part of defendant's acreage in Parcel Two is riparian, upon what part of it the water might rightly be used, what portion is under or susceptible of present cultivation, and what portion is devoted to resort purposes.

The question to what extent the use of water by paying guests residing on riparian land is a domestic use, sometimes called a natural use, as distinguished from a commercial use, often referred to as an artificial use, is one on which no authority directly in point is cited. The distinction between so-called natural and artificial uses of water and the elements to be considered in making an apportionment are discussed in

*Lux* v. *Haggin,* 69 Cal. 255, 406-409 [4 P. 919, 10 P. 674];
*Charnock* v. *Higuerra,* 111 Cal. 473, 478-481 [44 P. 171, 52
Am.St.Rep. 195, 32 L.R.A. 190]; 25 Cal.Jur., pp. 1116-1119,
1139-1146; 1 Wiel on Water Rights (3d ed.), pp. 795-831; and
Kinney on Irrigation and Water Rights (2d ed.), pp. 831
et seq.

■ Without question the authorities approve the use of
water for domestic purposes as first entitled to preference.
That use includes consumption for the sustenance of human
beings, for household conveniences, and for the care of live-
stock. ■ The fact that human beings are occupants of
hotels, apartment houses, boarding houses, auto camps, or
resorts such as those conducted by the parties to this action
does not necessarily exclude them from the preferential class.
(*Frederick* v. *Bognor Water Co.,* 78 L.J. ch. 40; 21 Mews'
Digest of English Case Law, p. 738.) But it may well be that
the commercial character of the proprietor's business in serv-
ing his guests may be so extensive that a lower riparian whose
domestic use, whether or not commercialized, would be prej-
udiced by the business activities of the upper riparian and
to such an extent as to require the interposition of a court of
equity to safeguard his rights. This would especially be true
where swimming pools, ornamental pools, boating, and the
like are furnished as a part of the service to the guests (see
Wiel, *supra,* pp. 803-807), which uses, in themselves, have
been held to be not domestic. (*Bernard Castle Urban Coun-
cil* v. *Wilson,* 71 L.J.ch. 825, 21 Mews' Digest of English Case
Law, p. 742.) The question is whether under all the circum-
stances of the case the use of water by the one is reasonable
and consistent with the corresponding enjoyment of the right
by the other. (*Dumont* v. *Kellogg* [1874], 29 Mich. 420 [18
Am.Rep. 102].) What constitutes reasonable use is, in the
first instance, a question for the trier of facts.

It will be noted that here the judgment places defendant
in the position of being unable to use the diverted water upon
Parcel Two unless or until the court exercises its reserved
jurisdiction to determine what portion, if any, of that parcel
is riparian. If any portion of Parcel Two is riparian defend-
ant should not be restrained from using the water upon it or
be required to suspend operations thereon.

Complaint is made of other provisions of the judgment, such
as that which permits plaintiffs to develop a further water

supply by pumping on condition that they deliver 6,000 gallons a day to defendant, but restrains defendant from augmenting his sources of supply by any pumping whatsoever upon Parcel One. As the questioned provisions will probably not be incorporated in a judgment to be entered on a retrial, they need not be here discussed.

The judgment is reversed.

Gibson, C. J., Curtis, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Respondents' petition for a rehearing was denied August 17, 1944.